George E. REYNOLDS, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 7490.

United States Court of Appeals Fourth Circuit.

Argued Oct. 24, 1957.

Decided Nov. 7, 1957.

Andrew D. Sharpe, Washington, D. C. (H. Stewart McDonald, Washington, D. C., on brief), for petitioner.

L. W. Post, Attorney, Department of Justice, Washington, D. C. (John N. Stull, Acting Asst. Atty. Gen., and Lee A. Jackson, Attorney, Department of Justice, Washington, D. C., on brief), for respondent.

Before PARKER, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOPER, Circuit Judge.

This petition to review a decision of the Tax Court raises the question whether the taxpayer, who received the sum of $55,536 in 1942 for services rendered over a period of thirty-six months, is entitled, in computing his tax liability for the year, to spread the payment over the period in which the services were rendered under § 107(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 107(a).[1]

The taxpayer was a sales agent in the Washington area for Marmon-Herrington Company, Inc., and for certain other manufacturers of automotive products. In this field he rendered services to Marmon under a series of contracts, the latest of which was dated January 1, 1940, which required him to serve as salesman of Marmon products in Wash-

---

1. Sec. 107(a) "*Personal services.* If at least 80 per centum of the total compensation for personal services covering a period of thirty-six calendar months or more (from the beginning to the completion of such services) is received or accrued in one taxable year by an individual or a partnership, the tax at- tributable to any part thereof which is included in the gross income of any individual shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual."

ington, including Marmon products sold to the United States, and entitled him to a fixed salary of $200 per month plus specified commissions on sales, including a commission of one per cent on sales of tanks to the United States.

In August 1939, and thereafter until 1942, the taxpayer worked on an order for Marmon tanks to be sold to the United States for the Chinese Government under the lend-lease program, and on February 13, 1942, his efforts culminated in a formal contract between the United States and Marmon for 240 tanks in the sum of $5,553,600, whereupon the taxpayer became entitled to a one per cent commission amounting to $55,536 when the tanks were delivered. Deliveries subsequently took place and were completed some time in 1944. On May 12, 1942, the taxpayer received $4,628 from Marmon, which represented his commission on 20 tanks which had been delivered. In April, May, June and July of 1942 commissions of varying amounts for the remainder of the tanks, in the aggregate sum of $51,205.63, were accrued on Marmon's books, but the tanks had not been delivered and commissions were not then paid.

During this year (1942) differences arose between Marmon and the taxpayer as to the amount of commissions which were then or would thereafter become due and payable to the taxpayer under the contract of January 1, 1940, which fixed the compensation of the taxpayer for the sale of Marmon products generally. On August 31, 1942, these differences were composed by an agreement of settlement under which all contracts between the parties were cancelled; the taxpayer received a lump sum payment of $75,000, released the corporation from all claims and demands, and entered the employ of the corporation as vice-president at the annual salary of $15,000 per year.

Of the sum of $75,000 paid to the taxpayer $52,263 was carried as a debit to an account on Marmon's books, in which account the commissions in respect of the 240 tanks had been previously en-

tered as credits. The remaining $22,-734.37 was entered as a debit in another account on Marmon's books entitled "Selling Expense Commission." According to the testimony of the taxpayer, the sum of $75,000 paid him in settlement was arrived at after he produced a list of commissions due him on sales, which included the sum of $55,536 for the Chinese tanks. This item, together with other items on other sales, was somewhat in excess of $75,000 but approximated this figure and was finally agreed upon as the amount to be paid in settlement of the dispute.

The Tax Court held under this state of facts that the taxpayer failed to prove that he was paid $55,536 for his three-year work on the tank contract since the lump sum payment of $75,000 covered all claims of the taxpayer, present and prospective, without separate evaluation and without allocation of a specific part of the payment to the commissions on the tanks. In addition, the Court held that even if the taxpayer got full compensation on the 240 tanks in 1942 the payment did not amount to "at least 80 per centum of the total compensation for personal services covering a period of thirty-six calendar months or more" as required by the statute.

We think that the first ground of decision need not be discussed since the second ground furnishes ample basis for the Court's finding. On this point the Court said:

"But even if it be assumed that petitioner did in fact receive $55,-536 in 1942 as compensation for his services in connection with the sale of the 240 tanks, section 107(a) is not, in our opinion, susceptible of the interpretation and application contended for. The facts show that petitioner was employed generally as Marmon's Washington sales representative and that his employment with respect to the sale of the said tanks and the services rendered with reference to the sale were not separate or separable from his general employment as Marmon's Washing-

ton sales representative. He was to receive for his services as such salesman a fixed salary of $200 per month, plus specified commissions where his efforts in performance of those services resulted in actual sales. The fact that such added compensation was to be realized only where the sales efforts did result in a sale and his compensation in part was to be computed with specific reference to individual sales, does not make or cause the employment contract to be a series of individual or separable contracts, or the services to be rendered on the sale of one item or group of items divisible, for the purposes of section 107, from the sales services for which he was generally employed."

The taxpayer urges that this is a mistaken view since the sale of the tanks was a major project requiring extraordinary services and constant attention over a long period in the modification of designs and equipment and, therefore, should not be regarded as an ordinary sale covered by the general contract of January 1, 1940. He points to the fact that during the eleven years from 1931 to 1941 inclusive he received from Marmon for all of his services a total of $54,604.70, which included $31,588 for commissions on sales; and that when the contract of 1940 was signed the parties did not conceive the idea that a tank contract of such size could be secured, since prior to the war such contracts covered only from one to four vehicles. Hence, he says that the contract for the Chinese tanks was an extraordinary project of a magnitude so far in excess of any in the contemplation of the parties when the contract was signed that it should be regarded as a separate and independent undertaking.

It does not seem to us that the sale of the tanks should be considered outside the scope of the salesman's contract with Marmon simply because of its magnitude. That contract was broad enough to cover the unusual sale by its express terms, and it was actually applied by the parties in using the contract figure of one per cent to compute the taxpayer's commissions. Moreover, neither party made any suggestion that the contract did not govern during the whole three-year period of the negotiations that culminated in the sale. On the contrary, the first payment of commissions for the 20 tanks delivered in 1942 and the entries on Marmon's books for the accrued commissions on the rest of the tanks were made in accordance with the provisions of the contract. It was only when the magnitude of the business to be done with the United States during the war was realized that the commission feature of the old contract was abandoned and the taxpayer agreed to work for the corporation on a salary basis, the employment to continue so long as the services of the taxpayer should be deemed necessary in the discretion of the directors of the company.

Since the commissions on the tank contract did not amount to 80 per cent of the total compensation received by the taxpayer under his contract with Marmon during the preceding three years— it was not even 80 per cent of the total compensation received in the year 1942— we must hold, in accordance with the authorities, that the services of the taxpayer cannot be broken into parts so as to give him the benefit of the statute. See Smart v. Commissioner, 2 Cir., 152 F.2d 333; Spears v. Commissioner, 3 Cir., 164 F.2d 486; Englar's Estate v. Commissioner, 2 Cir., 166 F.2d 540; Cowan v. Hensley, 6 Cir., 180 F.2d 73. The statute provides an exemption and the burden is upon the taxpayer to show that he comes within its provision. It is of course true that services may be so separate and distinct from a general employment as to warrant severance for the purposes of § 107. Such a case was Chase v. Commissioner, 9 Cir., 245 F.2d 288, where the taxpayer served both as executor for an estate, for which he was paid commissions, and also rendered extraordinary legal services for the estate in connection with litigation involving the construction of the will. It was

there held that the latter services were rendered as a separate and independent undertaking and that the taxpayer was entitled to the benefit of the statute. See also Terrell v. Commissioner, 14 T.C. 572. In the pending case, however, the Tax Court's decision that all the services rendered by the taxpayer were covered by a single contract of employment is supported by substantial evidence.[2]

Affirmed.

---

2. See § 7482, Internal Revenue Code, 26 U.S.C.A. § 7482; Rule 52(a), Fed.Rules Civ. Proc. 28 U.S.C.A.