Maurice J. BREEN and Alyce J. Breen, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 17308.

United States Court of Appeals Eighth Circuit.

Feb. 26, 1964.

Maurice J. Breen, Fort Dodge, Iowa, for petitioners.

Richard W. Perkins, Atty., Dept. of Justice, Washington, D. C., for respondent; Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson and Earl J. Silbert, Attys., Tax Div., Dept. of Justice, Washington, D. C., on the brief.

Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and HANSON, District Judge.

### BLACKMUN, Circuit Judge.

Maurice J. Breen, a cash basis taxpayer, and his wife, have petitioned for review of the Tax Court's determination of deficiencies in their federal income taxes for the calendar years 1955 and 1956. Four issues were presented to the Tax Court. Two were decided adversely to the taxpayer and are here before us. The other two were decided largely in the taxpayer's favor. Judge Mulroney's opinion, not reviewed by the entire court, is T. C. Memo 1962–230. The Commissioner filed a cross-petition for review but it has been dismissed by this court on stipulation of the parties. Commissioner v. Breen, 316 F.2d 735 (8 Cir. 1963).

The issues are:

1. Whether the taxpayer was entitled, with respect to a $4,200 fee received in 1955, to the benefit of the spreading provisions of § 1301 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 1301.

2. Whether gains the taxpayer realized in 1955 and 1956 on two trustee's certificates were ordinary income or were long term capital gain under § 1222(3), 26 U.S.C.A. § 1222(3).

The facts, most of them stipulated, are not in dispute: W. N. Merritt died in May 1928. Among his assets at his death were undivided interests in two tracts of real estate near Des Moines in Polk County, Iowa. These were heavily mortgaged. The taxpayer, a practicing lawyer, was named as executor and trustee in the decedent's will.

The assets of Merritt's estate were insufficient to meet the claims of creditors. In September 1930, a "Trust Agreement and Appointment of Attorney in Fact" was executed by the six major creditors, whose claims aggregated about $27,500, and the will beneficiaries and with a bank as trustee. This agreement provided that (a) the six creditors released their claims against the estate; (b) the trustee assumed the title to the decedent's interests in the Polk County real estate and to certain stock not significant here; (c) the release of the claims was the purchase price for that property; (d) the trustee was authorized to convey the real estate interests so received to Urbandale Coal and Acreage Company, a newly organized Iowa corporation, in exchange for half its stock; (e) the trustee was

to hold that stock as trust property "and as security for notes evidencing the * * * indebtedness" to the creditors and to apply income of the trust in payment of interest and principal; (f) Urbandale was to receive, in exchange for the other half of its stock, equal undivided interests owned by attorney D. M. Kelleher in the same real estate; and (g) the trustee was to hold the trust property until the indebtedness to creditors and the interest thereon were "paid in full, and thereafter hold the same for distribution to * * * the beneficiaries under the will of said W. N. Merritt in the proportions they are entitled to share in the Estate of said Testator".[1]

The trustee issued a certificate to each of the six creditors. This recited that the creditor was the owner of a stated percentage "of the equitable ownership and beneficial interest in" the stock, including preferred and common of Urbandale, held by the trustee "for the benefit of the holder or holders of this certificate and all similar certificates issued"; that "when said interest and principal have been paid in full through the disbursements of said trustee, then this certificate shall have no more value"; and that the certificate "may be assigned and transferred".

Almost 24 years later, in April 1954, the taxpayer purchased for $2,500 a trustee's certificate representing a 46.66% interest in the trust and an original creditor's claim of $12,923.92. A week later the taxpayer purchased for $150 a second certificate representing a 3.84% interest and a creditor's claim of $1,050.

Meanwhile, through a working mining company, Urbandale operated the coal mine on the Polk County land on a royalty basis until 1947. In December 1952 the Merritt estate beneficiaries gave Urbandale a quit-claim deed to the land.

During this entire period the taxpayer was president of Urbandale, Kelleher was vice-president, and Mrs. Kelleher was secretary-treasurer. These three also comprised the directorship of the corporation during its corporate life.

When the mining operations ceased, the taxpayer, as president of Urbandale, began to negotiate for the sale of the land. This pursuit proved successful and late in 1954 the land was sold. Urbandale then adopted a resolution to liquidate. In March 1955 Urbandale's shareholders approved payment of a $4,200 fee to the taxpayer and of a like fee to Mrs. Kelleher. The authorizing resolution stated that, throughout its corporate existence of more than 24 years, no compensation had ever been paid to any officer or director, and

"(1) That the said Maurice J. Breen and Mary S. Kelleher, each, be allowed the sum of $200.00 a year for their services as directors, and their services in attending board meetings and committee meetings, and other incidental work connected with the management of said corporation.

"(2) That said allowance extend over the first twenty-one years of the life of this corporation, as said twenty-one years covers the active operation of this corporation while it was engaged in the production of coal, and that said allowance to each of said named directors, to wit, Mary S. Kelleher and Maurice J. Breen, be in the sum of $4200.00 each."

The taxpayer's $4,200 fee was paid in 1955. Except for a $500 fee paid in December 1949 for legal services on a special matter, the taxpayer had received no other compensation from Urbandale.

The trustee, from 1931 through 1956, made payments to the certificate holders. These were distributions from the coal royalties and upon the liquidation. Breen received approximately $8,250 in 1955 and $13,350 in 1956 upon the two certificates he had purchased in 1954. He thereby realized gain.

1. Apparently there were other assets of the Merritt estate which were not so transferred to the bank as trustee; these, instead, were retained by Breen as the fiduciary under the Merritt will. He received fees for his services in that capacity, but that remuneration is not now claimed to have significance.

1. The $4,200 payment. In his 1955 return the taxpayer claimed the benefit of § 1301 for this fee. The Commissioner ruled otherwise.

The taxpayer's argument here is that depression conditions prevailed after the inception of the Merritt estate; that the real estate, because of its location near Des Moines, had subdivision potential; that the coal royalties were intended to provide for the payment of interest, taxes, and mortgage requirements until the land could be sold advantageously; that sale of the land at a proper price was the desire of the taxpayer and Kelleher and the creditors; that the taxpayer acted as president, director, and liquidating agent of Urbandale but until 1954 had no ownership interest of any kind in that corporation; that his only purpose was to handle Urbandale so that the land could be liquidated for the certificate holders; that his duties were not those of a managing officer of a conventional corporation but were directed, instead, to working out the sale; that there are many cases under the 1939 Code which apply the statutory benefit to payments received for corporate management; and that § 1301 in this respect effected no change in the prior law.

This argument has some appeal but it is not sufficient. Furthermore, the record does not fully support it.

Those portions of § 1301 which are pertinent here are set forth in the margin.[2] The section's predecessor was § 107(a) of the 1939 Code, as amended.[3] The statute originally appeared in § 220(a) of the Revenue Act of 1939; this was amended by § 139(a) of the 1942 Act. These pre-1954 forms of the statute all referred to compensation "for personal services" and were not embellished with the "an employment" and the "to effect a particular result" language of the 1954 version. It is said that the 1954 change was made to express more accurately the intended meaning and to eliminate tendencies to combine or to separate services as suited one's tax convenience. Senate Report No. 1622, 83d Cong., 2d Sess., pp. 445–46; House Report No. 1337, 83d Cong., 2d Sess., p. A289, U.S.Code Cong. and Adm. News 1954, p. 4025. Only in this narrow sense of clarifying "the intended meaning" is the taxpayer correct in saying that the 1954 Code did not change the earlier statute. See Wattley v. Commissioner, 275 F.2d 461, 464 (2 Cir. 1960), cert. denied 364 U.S. 864, 81 S.Ct. 107, 5 L.Ed.2d 86.

2. § 1301. "(a) Limitation on tax.—If an individual * * *
  "(1) engages in an employment as defined in subsection (b); and
  "(2) the employment covers a period of 36 months or more * * * and
  "(3) the gross compensation from the employment received or accrued in the taxable year of the individual * * * is not less than 80 percent of the total compensation from such employment,
then the tax attributable to any part of the compensation which is included in the gross income of any individual shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual.
  "(b) Definition of an employment.— For purposes of this section, the term 'an employment' means an arrangement or series of arrangements for the performance of personal services by an individual * * * to effect a particular result, regardless of the number of sources from which compensation therefor is obtained."

3. § 107. "(a) Personal services. If at least 80 per centum of the total compensation for personal services covering a period of thirty-six calendar months or more (from the beginning to the completion of such services) is received or accrued in one taxable year by an individual * * *, the tax attributable to any part thereof which is included in the gross income of any individual shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual."

■ There is a suggestion in the taxpayer's brief that, because the fee was for services rendered in calendar years prior to 1954, it is the 1939 Code, rather than the 1954 Code, which applies. We cannot agree. The fee was paid in 1955 to this cash basis taxpayer. The 1954 Code, accordingly, controls. This result seems obvious from the very language of the Code and from its § 7851(a) (1) (A). See United States v. Whitney Land Co., 324 F.2d 33 (8 Cir. 1963) and McClure v. United States, 228 F.2d 322, 324 (4 Cir. 1955). We note that in at least one other case this conclusion has been taken for granted, even though part of the earnings period preceded the effective date of the 1954 Code. Frank Stephen Ranz, 31 T.C. 91 (1958), affirmed, Ranz v. Commissioner, 273 F.2d 810 (6 Cir. 1960).

■ The purpose of § 1301 and its predecessors was obviously to grant relief, apparently at the option of the taxpayer, United States v. Behle, 316 F.2d 134, 135 (10 Cir. 1963); Guy C. Myers, 12 T.C. 648 (1949), from tax hardship otherwise resulting upon the bunching of income received for personal services rendered over a long period of time. Chase v. Commissioner, 245 F.2d 288, 290 (9 Cir. 1957); Van Hook v. United States, 204 F.2d 25, 27 (7 Cir. 1953), cert. denied 346 U.S. 825, 74 S.Ct. 42, 98 L.Ed. 350; Senate Report No. 648, 76th Cong., 1st Sess., p. 7; 1939- 2 C.B. 524, 528–29. But, being a relief statute, it is to be given "close scrutiny" and is not entitled to a liberal interpretation. Smart v. Commissioner, 152 F.2d 333, 335 (2 Cir. 1945), cert. denied 327 U.S. 804, 66 S.Ct. 962, 90 L.Ed. 1028; Ranz v. Commissioner, supra, p. 813 of 273 F.2d; Zillmer v. United States, 233 F.2d 912, 914 (7 Cir. 1956); Faul v. Commissioner, 263 F.2d 645, 650 (9 Cir. 1959); see Wattley v. Commissioner, supra, p. 465 of 275 F.2d, and Helvering v. Northwest Steel Rolling Mills, Inc., 311 U.S. 46, 49, 61 S.Ct. 109, 85 L.Ed. 29 (1940); cf. Slough v. Commissioner, 147 F.2d 836, 839 (6 Cir. 1945). The burden is on the taxpayer to show that he comes within the favor of the statute. Reynolds v. Commissioner, 249 F.2d 259, 261 (4 Cir. 1957); Van Hook v. United States, supra, p. 28 of 204 F.2d; Sloane v. Commissioner, 188 F.2d 254, 261 (6 Cir. 1951); Lindstrom v. Commissioner, 149 F.2d 344, 346 (9 Cir. 1945); United States v. Robertson, 190 F.2d 680, 683 (10 Cir. 1951), affirmed, 343 U.S. 711, 72 S.Ct. 994, 96 L.Ed. 1237.

■ There is no question here about the satisfaction of the 36 month and 80% requirements of the statute or about the fee's being a payment for personal services. The question thus is the narrow one whether Mr. Breen's personal services qualify as "an employment * * * to effect a particular result".

We, as did the Tax Court, conclude that the answer to this question is in the negative. We do so because of several factors. First, the Urbandale resolution is almost conclusively destructive of the taxpayer's position. The $200 a year compensation is described as payment for "services as directors" and for attending meetings ·and for "other incidental work connected with the management". The 21 year period is said to cover the active operation of the corporation "while it was engaged in the production of coal". Breen himself voted in the affirmative for this resolution. Whether or not, as the taxpayer speculates in his brief, the language was that of Mr. Kelleher and was drawn in the light of Kelleher's own social security situation, we do not know. We must take the record as we find it. When we do so, the resolution's language rings with the tone of general services and not at all with that "to effect a particular result". Second, the resolution reveals nothing by way of recognition of a primary purpose in the taxpayer's employment. Third, the trustee's final court report recites that "shortly after the coal ceased to be mined" the taxpayer "began negotiations with various prospects to sell all, or a substantial portion, of said land". This indicates that the real effort for the sale came only from 1947 on, after the mining ceased to be productive and had ended and when the

bulk of the 21 year period had already elapsed. Fourth, no explanation is offered as to the nature of Mrs. Kelleher's fee. This paves the way for an inference that the fees were divided equally between Mr. Breen, as representative of the certificate holders, and Kelleher, as the owner of the other half of the trust's beneficial interests. All this provides a sufficient and appropriate basis for the Tax Court's finding and conclusion that the taxpayer's services were not "an employment" within § 1301(b) of the 1954 Code.

What few authorities there are lend support to this result. Regs., § 1.1301–2 (b) (1) (i) and (ii) and 2(b) (2), Example (1), illustrate the denial of the statutory benefit for "general services" and make the facts of each case govern its disposition. Ranz v. Commissioner, supra, 273 F.2d 810 (6 Cir. 1960), concerned commissions received by a sales agent in 1954. His contract of employment was to sell equipment. His intensive work over several years resulted in orders from Ford Motor Co. The Sixth Circuit observed, p. 812 of 273 F. 2d, that the agreement "appears to be free from ambiguity and contains no terms or provisions from which it could be concluded that it was the purpose of the parties to particularize its objects and purposes in the manner insisted upon by petitioner. On the contrary * * * it is clear that its purpose was to employ the petitioner as a general sales representative in his area * * *. It was not an agreement to sell to Ford alone * * *." The Tax Court's refusal to apply the statute was accordingly affirmed.

Wattley v. Commissioner, supra, 275 F.2d 461 (2 Cir. 1960), does not give the taxpayer the support he claims. That taxpayer was a real estate broker. Over a period of years he attempted to obtain a lease on certain New York City property. His effort finally proved successful and in 1951 he received his commission. The 1939 Code was thus applicable. The court did observe, p. 464 of 275 F.2d, with respect to the 1954 Code, that "it

appears that the Congress did not suppose that it was changing the meaning of § 107(a) when it was enacting § 1301 in its present form", but this comment is obviously concerned with the statute's basic purpose which we have already noted above. The facts of Wattley, it seems to us, are those of a broker's efforts to obtain a lease for a specific piece of property. His work was directly concerned with the renting of that real estate. His activity was "to effect a particular result".

Wattley would support the taxpayer's position here were his employment made, as he contends, only to effect the sale of the Polk County real estate. But his activities were broader than that. He was a director and an officer and the management force behind Urbandale. He was responsible for its coal royalties. His services were all incidental to his various corporate capacities and responsibilities. While sale may have been the ultimate objective, his activities were not confined to that target. See Reynolds v. Commissioner, supra, 249 F.2d 259, 261. Whatever the result might have been under §.107(a) of the 1939 Code, which we do not pass upon, his position is defeated by the restrictions of the 1954 Code.

2. The receipts from the trust certificates. The taxpayer reported his gain upon these receipts as long term capital gain. The Commissioner ruled that it was ordinary income.

The taxpayer's approach is that his acquisition of the two certificates gave him an "interest in the Urbandale corporation stock"; that Urbandale made distributions in liquidation or redemption of its stock which, by § 331(a) (1) or by § 302 (a) and (b) (3), are to be treated as in "full payment in exchange for the stock"; that the claims against the estate were discharged in 1930; that the estate's interest in the land was sold for the amount of the six claims; that the certificates themselves recited that the holder is an owner of a stated percentage of the Urbandale and other stock; that the references to "notes" and the like which crept into the papers were loose language used

long ago; that the trustee had no authority to issue a note or evidence of indebtedness; that each former claimant's position, with the 6% provision, was similar to that of a holder of preferred stock; that the will beneficiaries were like common shareholders; and that the certificates were pledges and not notes because no one agreed to pay a specific sum at any time to anyone and no one agreed that he was indebted to the former creditors.

Viewing the case upon its particular facts, Frank v. Commissioner, 321 F.2d 143, 148 (8 Cir. 1963), we think the result reached by the Tax Court on this issue was also correct.

■  For present purposes we may assume, as did the Tax Court, that the certificates were capital assets under § 1221's general definition of "property held by the taxpayer". And they were held by this taxpayer more than six months. The inquiry then is only whether the gain resulted from a "sale or exchange". This, of course, is essential if it is to qualify as long term capital gain. Dobson v. Commissioner, 321 U.S. 231, 232, 64 S.Ct. 495, 88 L.Ed. 691 (1944); Commissioner v. Gillette Motor Transport, Inc., 364 U.S. 130, 133, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960).

■  It is well established that apart from the existence of a qualifying definition, payments made upon an obligation do not constitute a sale or exchange. Fairbanks v. United States, 306 U.S. 436, 437, 59 S.Ct. 607, 83 L.Ed. 855 (1939); Graham v. Commissioner, 304 F.2d 707, 708 (2 Cir. 1962); see Paine v. Commissioner, 236 F.2d 398 (8 Cir.1956). Just such a special definition is contained in § 1232(a) (1) with respect to certain evidences of indebtedness. Section 1232 first appeared as § 117(f) of the Revenue Act of 1934 and was intended to "take out of the bad debt provision certain transactions and to place them in the category of capital gains and losses", McClain v. Commissioner, 311 U.S. 527, 529, 61 S.Ct. 373, 375, 85 L.Ed. 319 (1941). No alternative contention, however, is made by this taxpayer that § 1232 has any application to these certificates and, indeed, we do not see how it could be made in view of the statute's language.

No other statute which would define the transaction before us as a sale or exchange is suggested. As a consequence, Fairbanks and the cases which follow it control the present situation if the distributions to the taxpayer were payments upon an obligation.

■■  That they were exactly that is a result which seems to us to be unavoidable. It is true that each certificate recites that the holder "is the owner of [a stated percentage] of the equitable ownership and beneficial interest in" named stocks, including Urbandale, "title to which" is held by the trustee "for the benefit of the holder". But labels do not determine ultimate character. Carlberg v. United States, 281 F.2d 507, 514 (8 Cir. 1960). Other characteristics of the certificates and the contents of other pertinent documents readily convince us that the agreement-certificate-trustee arrangement was simply one for the benefit of the six creditors concerned and was in the nature of an assignment for the benefit of those creditors. We are impressed in this connection with the following: (a) The agreement's provisions that the trustee is to hold the Urbandale stock "as trust property and as security for notes evidencing the amount of present indebtedness of creditors of said estate" and "as security for the claims of said above described creditors until the whole amount of the said above enumerated debts with interest thereon are paid in full"; that the trustee is to apply income "to the payment of interest and the liquidation of the principal amount of said indebtedness" and "of said notes"; that if and when payment in full is effected, the assets shall be distributed to the will beneficiaries and not to the certificate holders; that the "notes to be made by said trustee to evidence said indebtedness shall draw interest" at 6% payable semi-annually; that the certificate holders are designated as "credi-

tors" or "claimants"; that the proceeds of the sale of any stock shall be applied first "for the payment or liquidation of said Trustee's notes and interest thereon, and distribute the balance to the beneficiaries under the will"; and that the "trust shall continue until such time as all of said Trustee's notes" and "accumulated interest" are paid in full; (b) The instrument's "declaration" portion's providing for the execution of "such notes and instruments to the several above named creditors * * * with interest thereon", for the trustee's payments "in liquidation of said debts", and for the application of income upon "current interest" and the surplus "above said interest" upon the principal "of said obligations"; (c) Each trust certificate's recital that it represents "a claim" and "is to draw interest" and that when the interest and principal of the claims have been paid in full the "certificate shall have no more value"; (d) The trustee's final state court report's recital that the claims "drew interest", that "the total amount of the debt set up in said trust" was still more than $27,000, that the trustee had distributed "the money in said trust, as it was received, to the several creditors", that the will beneficiaries received nothing, and that "Your trustee further states and shows that it has in fact been more or less nothing but an assignee of certain assets for the benefit of creditors; in fact, that was the only purpose of the contract * * *"; (e) The report's exhibits showing distributions "to the creditors" and the amounts of the "claims" from time to time, with additions of "interest", and payments made; (f) The waiver, filed with the state court, describing its signers as "creditors of the above trust"; (g) The state court's order closing the trusteeship reciting that it had for hearing the final report of the bank "described as a trustee, but in fact an assignee for the creditors in the estate of W. N. Merritt" and that "the creditors or beneficiaries of the bank trust, have all filed releases"; and (h) The court's finding that "the bank trust was in fact an assignment for the benefit of creditors rather than a trust".

The trust agreement did authorize the "surrender and release" of the six creditors' respective claims against the estate in payment for the Polk County real estate. This, however, we do not construe and interpret as effecting a novation or basic change in the posture of the six creditors and their successors. Their interests were still in the nature of claims definite in amount and with a specified interest rate. Instead of being applicable to all the assets of the decedent's estate, these became confined to those fewer assets which had come from the estate to the trustee by way of the "purchase" and pursuant to the understanding reached by all concerned. The release of the claims therefore had significance only as it freed untransferred assets of the estate from the claims of the six major creditors. These creditors' claims were still directed to the transferred assets.

Neither do we regard as opposingly significant the quitclaim deed executed by the will beneficiaries in 1952, before the taxpayer's acquisition of the two certificates in 1954 but after the coal mining operations had ceased. Its apparent purpose, it seems to us, was that of title clarification in anticipation of the real estate sale on which Mr. Breen, as president of Urbandale, was hard at work. Had the deed been intended to operate as a release of the will beneficiaries' interests under the agreement, it is reasonable to suppose that broader provisions to that effect would have been forthcoming.

In summary, the arrangement smacks throughout of indebtedness and of an assignment for the benefit of creditors. It appeared indisputably so at its inception and nothing that took place later convinces us that any change of character was effected. The taxpayer himself was the draftsman of most of the pertinent instruments. We doubt whether their language was unfortunately and unintendedly "loose", as the taxpayer would now describe it. We regard it as

truthfully representative of the situation as it existed in 1930 and as it continued to exist thereafter. The taxpayer's services culminated in a happy and amazingly successful result for the certificate holders including himself. But that fact does not change the essential character of those services. See, generally, Thomas v. Perkins, 108 F.2d 87 (5 Cir. 1939).

Affirmed.