## James B. Heidel and Joanna P. Heidel, Petitioners v. Commissioner of Internal Revenue, Respondent

Docket No. 5405-68. Filed April 20, 1971.

*Paul M. Newton, Robert S. Newton,* and *Ernest L. Shelton III,* for the petitioners.

*Robert W. Goodman,* for the respondent.

Drennen, *Judge:* Respondent determined a deficiency of $9,628 in petitioners' Federal income tax for the taxable year 1965.

The only issue for our decision is whether petitioner James B. Heidel (hereinafter referred to as petitioner) was an "eligible individual" in 1965 within the meaning of section 1303, I.R.C. 1954,[1] thereby entitling him to the benefit of income averaging under sections 1301 through 1305. Our determination of that issue in turn depends upon whether (1) the value of a Southeastern Conference grant-in-aid athletic scholarship received by petitioner constitutes support furnished by him for the year 1961 within the meaning of section 1303(c)(1), whereby petitioner would have furnished over half of his support in 1961, or (2) whether the $50,000 bonus received by petitioner from the St. Louis Football Cardinals in 1965 when he signed a contract to play professional football for them was income attributable to work performed by petitioner in substantial part during two or more of the base period years 1961 through 1964 within the purview of section 1303(c)(2)(B).

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners, husband and wife, resided at Greenville, Miss., at the time they filed their amended petition herein. They filed their joint

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, in effect in 1965.

Federal income tax return for the taxable year 1965 on the calendar year basis with the district director of internal revenue, Jackson, Miss.

During the period from September 1960, through May 1961, petitioner was a senior and a member of the football team at Yazoo City High School, Yazoo City, Miss. On December 7, 1960, petitioner applied to the University of Mississippi (also referred to herein as Ole Miss) for a Southeastern Conference athletic grant-in-aid scholarship. The application stated in pertinent part as follows:

I wish to attend the University of Mississippi provided you can award me some form of scholarship. If this request is granted, I shall accept and report for registration on or before 9/20/61. I have not applied to any other Southeastern Conference institution for a scholarship.

It is my understanding from the representative(s) of your institution who interviewed me that:

(1) THIS APPLICATION WILL BE ACTED UPON WITHIN THREE WEEKS FROM THE DATE OF ITS RECEIPT BY YOU.

(2) IF SCHOLARSHIP IS GRANTED BY YOU, I WILL NOT BE ELIGIBLE TO COMPETE IN ANOTHER SOUTHEASTERN CONFERENCE INSTITUTION DURING MY FRESHMAN AND SOPHOMORE YEARS.

(3) THE TOTAL AMOUNT OF AID WHICH I MAY RECEIVE SHALL NOT EXCEED TUITION, FEES, BOARD, ROOM, BOOKS AND LAUNDRY. THE ACCEPTANCE OF AID IN EXCESS OF THIS WILL CAUSE ME TO BE INELIGIBLE.

(4) APPLICATION FOR SCHOLARSHIP CANNOT BE SIGNED BY APPLICANT OR PARENT PRIOR TO DECEMBER 7 OF THE YEAR PRECEDING ENROLLMENT.

Both sides of this application have been read by me and my parent(s) (or guardian) and we understand the conditions contained therein, and we agree to abide by and observe the Southeastern Conference Constitution and By-laws.

The reverse side of the application provided as follows:

SOUTHEASTERN CONFERENCE

*Office of the Commissioner*

*To Prospective Students of Southeastern Conference Institutions:*
The By-laws of the Southeastern Conference permit member institutions to aid athletes to this extent:

1. Award a scholarship for tuition, fees, board, room, books and laundry.

2. Approve employment by which the recipient may earn his actual expenses, which are tuition, fees, board, room, books and laundry.

Any other financial aid promised or awarded to an athlete, or prospective athlete, is a violation of Conference rules.

*The Following are Violations of Conference Rules:*

1. Any financial aid to an athlete from any source other than the institution or persons on whom he may be naturally or legally dependent for support.

2. Any financial aid or promise of aid to any member of his family.

3. Promise of financial aid beyond his normal period of eligibility.

4. Summer or vacation employment for which a higher scale of pay is received by an athlete than is received by other employees doing the same type of work.

5. Award of money, gifts or promise of gifts equivalent to money, or lavish entertainment by anyone, including alumni or friends of an institution. (Example: clothes, television sets, radios, automobile, summer vacation, Bowl Game trips).

6. Transportation to and from school by the institution.

7. Tryouts, which include any demonstration of athletic ability.

*The Following are the Penalties for Violations of Conference Rules:*

A. Penalties for institutions:

   1. A fine not to exceed $1,000 for each such violation.

   2. Suspension from membership in the Conference.

B. Penalty for Recipient:

Ineligibility for competition in any intercollegiate sport within this Conference for the remainder of his college career.

BERNIE MOORE,<br>
<em>Commissioner</em>

On or about December 15, 1960, petitioner was awarded an athletic grant-in-aid scholarship by the University of Mississippi to commence in September 1961.

Prior to reporting to Ole Miss on or about August 28, 1961, petitioner had resided with his parents in Yazoo City. From August 28, 1961, until his graduation from Old Miss on June 5, 1966, except for the summer months, petitioner was a full-time student at Ole Miss.

During the calendar year 1961, petitioner's parents furnished $963.65 toward his support. Petitioner, excluding the value of his athletic scholarship, furnished $715.81 toward his own support in 1961, consisting of wages earned during the summer of 1961 in the net amount of $115.81 and distributions totaling $600 from a guardianship established for him in 1960. The value of petitioner's grant-in-aid during the period from August 28, 1961, to December 31, 1961, was $657.35. Petitioner furnished more than one-half of his support for the taxable years 1962, 1963, and 1964.

Petitioner did not file an income tax return for his taxable year ended December 31, 1961. His parents claimed a $600 exemption for him on the income tax return filed by them for their taxable year 1961.

During the period from on or about August 28, 1961, through December 18, 1965, petitioner actively participated in Ole Miss's intercollegiate athletic program. Petitioner served as a member of the freshman football team during the 1961 year, and as a member of the varsity football team during the years 1963, 1964, and 1965. During this time, petitioner observed prescribed training rules, and during the spring and fall of each year, he participated in daily practice and strategy sessions designed to physically and mentally condition petitioner and enhance his ability to perform services as an athlete.

During the years 1963 and 1964, petitioner served as a varsity defensive halfback with the Ole Miss football team. His performance during those years, both on the practice field and in actual intercollegi-

ate competition, was observed by scouts from a number of professional football teams in both the American Football League and the National Football League. Both of these professional football leagues conducted annual selection meetings near the end of each calendar year at which the member teams, on a rotation basis, selected or "drafted" college athletes whom they would, by league rules, have the right to employ. Petitioner was drafted by the New York Jets of the American Football League in December of 1964, and as a defensive safety by the St. Louis Football Cardinals of the National Football League on November 29, 1964.

During the year 1965, petitioner served as a varsity quarterback on the Old Miss team, but the St. Louis Football Cardinals' scouting reports reflect that petitioner was considered as professional material only as a defensive back and not as a quarterback. Petitioner completed his college football career with Old Miss in the Liberty Bowl in Memphis, Tenn., on December 18, 1965.

Petitioner was offered and accepted contracts of employment for the years 1966 and 1967 on December 20, 1965, with the Chicago Cardinals Football Club, doing business as the St. Louis Football Cardinals, and in 1966 and 1967 served as a defensive halfback and defensive safety. Petitioner received on or about December 20, 1965, from the Chicago Cardinals Football Club $50,000 as a bonus, $5,000 as additional compensation, and $1,000 as travel funds. Petitioner's employment by the Chicago Cardinals Football Club in 1965 was attributable in substantial part to his performance with the University of Mississippi football team during the years 1963 and 1964.

The rider attached to the National Football League Standard Players Contract signed by petitioner which provided for the payment of the bonus states as follows:

As additional consideration for the execution of the contract above referred to and for the agreement of the player to report for play and practice with the club, and to perform all of the things required by him to be performed under said contract, the club agrees to pay the player the sum of $50,000.00. By the execution hereof, the player acknowledges receipt of said sum of $50,000.00 from the club and agrees to report and play football for the club and to perform all things required by him to be performed under said contract; it is distinctly understood that the additional sum specified in this paragraph shall be paid only for the year 1965 and shall not be deemed to be a part of the salary for the year 1966 specified in Paragraph 3 of said contract nor in connection with the exercise of any option on the Player's services in any succeeding season.

In the event the player either fails to report, to practice with or play for said club, or leaves the club without its consent, then, upon demand by the club, the Player shall be obligated to repay to the club said sum of $50,000.00 [2]

---

[a] Most of the above facts were stipulated.

The amount of a bonus paid by a professional football team is based to some extent on the previous college performance of an athlete. Not all college players who sign professional football contracts receive a bonus. Petitioner would probably not have been considered for a bonus had he not performed in football in college as he did.

In their joint income tax return for 1965 petitioners elected to compute their income tax liability under the income-averaging method provided in sections 1301–1305. Respondent disallowed the use of that method in the statutory notice of deficiency since he determined that petitioner was not an "eligible individual" within the meaning of section 1303.

## OPINION

Section 1301, I.R.C. 1954, provides that if an eligible individual has averagable income in excess of $3,000 for the computation year then the tax for the year may be computed in the manner set forth therein which is sometimes referred to as income averaging, by in effect spreading the excessive income received in the computation year evenly over the 4 preceding base period years and the computation year. The question before us is whether petitions may compute his income tax under the provisions of section 1301 for the year 1965, the year in which he received a bonus of $50,000, additional compensation of $5,000, and $1,000 as travel funds when he signed a contract to play professional football for the Chicago Cardinals Football Club, doing business as the St. Louis Football Cardinals. This in turn depends on whether petitioner qualified as an "eligible individual" as defined in section 1303. It is agreed by the parties that petitioner qualified under sections 1301 and 1303 unless he is disqualified as an eligible individual by the provisions of section 1303(c).[3]

Section 1303(c)(1) provides that an individual shall not be an eligible individual for the computation year if, for any base period year, such individual furnished less than one-half of his support. However,

---

[3] SEC. 1303. ELIGIBLE INDIVIDUALS.

(a) GENERAL RULE.—Except as otherwise provided in this section, for purposes of this part the term "eligible individual" means any individual who is a citizen or resident of the United States throughout the computation year.

(b) Nonresident Alien Individuals.—* * *

(c) INDIVIDUAL RECEIVING SUPPORT FROM OTHERS.—

(1) IN GENERAL.—For purposes of this part, an individual shall not be an eligible individual for the computation year if, for any base period year, such individual (and his spouse) furnished less than one-half of his support.

(2) EXCEPTIONS.—Paragraph (1) shall not apply to any computation year if—

(A) such year ends after the individual attained age 25 and, during at least 4 of his taxable years beginning after he attained age 21 and ending with his computation year, he was not a full-time student,

(B) more than one-half of the individual's adjusted taxable income for the computation year is attributable to work performed by him in substantial part during 2 or more of the base period years, or

paragraph (2) provides that paragraph (1) shall not apply to any computation year if any of the three exceptions provided therein apply. The only exception that might apply to petitioner is contained in subparagraph (B) which in effect provides that paragraph (1) shall not apply if more than one-half of the individual's adjusted taxable income for the computation year is attributable to work performed by him in substantial part during 2 or more of the base period years.

It is stipulated that petitioner furnished more than one-half of his support for 3 of the 4 base period years, 1962, 1963, and 1964. Thus, if petitioner provided at least one-half of his support for 1961 he is not disqualified under the general rule of paragraph (1) and may take advantage of section 1301. Or, even if he furnished less than one-half of his support for 1961, he may still qualify for the benefits of section 1301 if more than one-half of his adjusted taxable income for 1965 is attributable to work performed by him in substantial part during two or more of the base period years. Both of the issues thus presented are novel and appear to be of first impression before this Court. We will discuss them in the above order.

The first issue is whether petitioner furnished at least one-half of his support during the year 1961 in order to qualify as an "eligible individual" under section 1301 and section 1303(c)(1) of the Code.

It is stipulated that during the year 1961, petitioner's parents furnished his support to the extent of $963.65, and that petitioner furnished for his own support $600 from a guardianship established for him in 1960 and net wages of $151.81 earned by petitioner during the summer of 1961. It is further stipulated that the value of the athletic grant-in-aid received by petitioner from Ole Miss for the period August 28, 1961, to December 31, 1961, was $657.35. Thus the issue is narrowed by stipulation to whether the value of the grant-in-aid constituted support furnished by petitioner for himself during the year 1961.

In his briefs respondent agrees that the benefits petitioner received under the grant-in-aid, which consisted of tuition fees, board, room, textbooks, laundry, and medical expenses, constituted support as it is generally defined in section 1.152–1(a)(2)(i), Income Tax Regs.; that total support can include items received by the supported individual that do not constitute taxable income to him; and the fact that under section 152(d) of the Code the petitioner's parents did not have to "[take] into account" the benefits that petitioner received in 1961 under the grant-in-aid, does not negate the fact that such benefits constituted support.[4] Likewise, on brief, petitioner does not contend that the bene-

---

[4] It was stipulated that petitioner did not file an income tax return for 1961 and that his parents claimed a $600 exemption for him on their return for that year. However, the correctness of those actions are not issues before us.

fits he received under the grant-in-aid were anything other than a scholarship; but he does contend that since he performed services as an athlete in order to maintain that scholarship, the value thereof constituted support furnished by him.

It is therefore apparent that we are asked to decide this issue on the very narrow determination of whether the value of the grant-in-aid received by petitioner in 1961 was furnished by him or by a third party, the University of Mississippi. We will limit our consideration to a determination of that question. Both parties agree that there are no cases directly in point on this issue.

Section 1.1303–1(c)(1), Income Tax Regs., dealing with individuals receiving support from others, provides:

For purposes of determining, under section 1303(c)(1) and this paragraph, whether or not an individual supplied, for a given taxable year, 50 percent or more of his support, the rules of section 152 and the regulations thereunder shall be applied.

Section 151 of the Code allows as a deduction in computing taxable income one exemption of $600 for each dependent (as defined in section 152). Section 152 defines "dependent" as any specified individual (including a son) over half of whose support for the taxable year was received from the taxpayer.

Section 1.152–1(a)(2)(i) of the regulations states that for purposes of determining whether an individual received over half of his support from the taxpayer, there shall be taken into account the amount of support received from the taxpayer as compared to the entire amount of support which the individual received from all sources, including support which the individual himself supplied. Subdivision (ii) says further that in computing the amount which is contributed for the support of an individual, there must be included any amount which is contributed by such individual for his own support, including income which is ordinarily excludable from gross income, such as benefits received under the Social Security Act.

However, section 152(d) provides a special support test in case of students. Amounts received by students as scholarships for study at an educational institution shall not be taken into account in determining whether the student received more than half of his support from his parents. Section 1.152–1(c) of the regulations provides in part:

Amounts received as scholarships, as defined in paragraph (a) of § 1.117–3, for study at an educational institution shall not be considered in determining whether the taxpayer [parent] furnishes more than one-half the support of such individual. * * *

Section 1.117–3, Income Tax Regs., defines a scholarship as generally meaning an amount paid or allowed to, or for the benefit of, a student, to aid such individual in pursuing his studies.

Also, section 117(a) of the Code provides that the gross income of an individual does not include any amount received as a scholarship at an educational institution. Subsection (b) provides that in the case of an individual who is a candidate for a degree at an educational institution, subsection (a) shall not apply to that portion of any amount received which represents payment for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship.

Thus, while the regulations under section 1303(c)(1) refer us to the rules of section 152 for purposes of determining whether an individual supplied 50 percent or more of his support to meet the support test of section 1303(c)(1), we do not find the rules of section 152 very helpful in deciding the question we have before us. Those rules are directed toward determining whether an individual received more than 50 percent of his support from another individual, such as his parent, so the parent may claim a deduction for him as a dependent. For that purpose the general rule is that the parent claiming the dependency credit must take into consideration in determining the total support of the child, the entire amount of support received by the child from all sources, which we assume would include the scholarship here involved even though the value thereof is not taxable income to the child; but as an exception to the general rule, if the child is a student the value of the scholarship need not be taken into account for purposes of determining the total support of the child. So while it is clear under the rules of section 152 that petitioner's parents did not have to take into account the value of the scholarship in determining whether they are entitled to the dependency credit for petitioner, that is only because of the exception provided in the case of a student by section 152(d), and has little bearing on whether the value of the scholarship shall be considered support furnished to petitioner by himself or by the party supplying the scholarship.

Although we find no authority directly in point, several cases do provide some guidelines for applying the income-averaging statutes. In *Van Hook* v. *United States*, 204 F. 2d 25 (C.A. 7, 1953), it was stated that the purpose of section 107 of the 1939 Code (a predecessor of sections 1301–1305 of the 1954 Code) "was to grant relief from the 'hardship' falling upon persons 'who work for long periods of time without pay,' and then receive their compensation in a lump sum all in one year." It was also said that "A taxpayer who claims the benefit of that section must show that he comes squarely within the let-

ter and spirit of the Congressional grant." And in *Hendricks* v. *Commissioner*, 406 F. 2d 269 (1969), the Court of Appeals for the Fifth Circuit affirmed per curiam a Memorandum Opinion of this Court in which we said:

> Although the purpose of section 1301 and its predecessors was to grant relief from tax hardships otherwise resulting from the bunching of income received for personal services rendered over a long period of time, "[the section] is to be given 'close scrutiny' and is not entitled to a liberal interpretation." * * *

The literal language of section 1303(c) casts little light on the "letter and spirit of the Congressional grant" as applied to the circumstances here involved. Subsection (c)(1) provides simply that an individual shall not be an eligible individual for the computation year if for any base period year such individual furnished less than one-half of his support. We note, however, that paragraph (2)(A) provides that the general rule recited above does not apply if the computation year ends after the individual attained age 25 and, during at least four of his taxable years beginning after he attained age 21 and ending with his computation year, he was not a full-time student. Curiosity as to the reason for this exception to the general rule (which would not apply to petitioner) leads to the explanations in the reports of the House Ways and Means Committee, H. Rept. No. 749, 88th Cong., 1st Sess., p. 114, and the Senate Finance Committee, S. Rept. No. 830, 88th Cong., 2d Sess., p. 144, both of which recite that—

> To be eligible for averaging, one of the principal concerns is that the individual's income must have been subject to tax by the United States throughout the entire base period as well as the computation year. * * *

and

> A second concern of this provision is that the individual be a member of the labor force in both the computation year and in the 4 base period years. * * * However, it was not intended to exclude from the benefits of the averaging provision an individual who, although in the labor force, was unemployed in part or all of the base period years. * * * Thus, generally, individuals age 25 or over will be eligible for averaging so long as they have been out of school for at least 4 years since age 21.* * *

Petitioner hardly qualified, "within the letter and spirit of the Congressional grant," as indicated by the committee reports, as an individual to whom relief was sought to be granted by the income-averaging provisions. Throughout the base period years he was a full-time student, was not a regular member of the labor force, and the value of the scholarship which he claims as support furnished to himself was not subject to U.S. taxes.

Neither do we believe the value of the scholarship which petitioner must rely on to show that he provided at least 50 percent of his

support for 1961, can be considered support furnished by petitioner for himself within the rationale of the Supreme Court's opinion in *Bingler* v. *Johnson*, 394 U.S. 741, and section 117 of the Code.

Petitioner admits that the grant-in-aid he received from the University of Mississippi was a "scholarship" and thus excludable from income under section 117. But he claims that it was a special kind of scholarship in that he was required to play football for Ole Miss to continue to receive it. However, even if we accept this premise of which there is no proof in the record, this places him on the horns of a dilemma because section 117(b) provides that in the case of an individual who is a candidate for a degree, subsection (a) (which excludes scholarships from gross income) "shall not apply to that portion of any amount received which represents payment for * * * other services in the nature of part-time employment required as a condition to receiving the scholarship." In *Bingler* v. *Johnson*, *supra*, the Court recognized the ordinary understanding of "scholarships" "as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial *quid pro quo* from the recipients," and upheld the regulations under section 117 dealing with compensation which provided in effect that bargained-for payments, given only as a "*quo*" in return for the "*quid*" of services rendered, should not be excludable from income as "scholarship" funds. Thus, if we accept the premise that the grant-in-aid was received by petitioner in return for his services as a football player in order to include it in support furnished by petitioner for himself, it would not qualify as an amount received as a scholarship, and excludable from income. On the other hand, if the value of the grant-in-aid is to qualify as a scholarship and excludable from income, it must be considered as having been furnished by the university as a "no-strings educational grant" and could not be considered support furnished by petitioner for himself.

Petitioner cannot have it both ways. We believe that, even leaving aside the implications *inherent* in treating the value of his scholarship as received by petitioner in return for playing college football, it is more consistent with the ordinary understanding of athletic scholarships and the spirit and intent of Congress in requiring generally that an individual provide at least 50 percent of his support in the base period years to qualify for income averaging to conclude that the value of the grant-in-aid afforded to petitioner in 1961 cannot be included in the amount of support furnished by petitioner for himself within the meaning of section 1303(c)(1) of the Code.

Consequently, we conclude that petitioner did not furnish at least 50 percent of his support for 1961 and therefore was not an "eligible

individual" for 1965 under section 1303(c)(1), unless he comes within one of the exceptions provided in paragraph (2) of that section.

As previously stated the only exception contained in paragraph (2) that might apply to petitioner is the exception contained in subparagraph (B). That provides that paragraph (1) shall not apply if more than one-half of the adjusted taxable income for the computation year is attributable to work performed by him in substantial part during two or more of the base period years. Thus the question is: Was the bonus paid to petitioner when he signed the pro-football contract in December 1965 attributable to "work performed during 2 or more of the base period years?"

Petitioner claims that the efforts, activities, and performance by petitioner during the years 1961 through 1964 in connection with playing college football at Ole Miss constituted work within the meaning of subparagraph (B) of section 1303(c)(2) and that the bonus received by petitioner in 1965 was attributable to such work performed by him in substantial part during the years 1963 and 1964.[5] Respondent determined that the bonus was not attributable to work performed in substantial part by petitioner in the base period years because it was either paid as an inducement to petitioner to sign the pro-football contract or was an advance payment made to petitioner to play professional football in future years. The burden of proof is on petitioner.

The terms of the contract tend to support respondent's position. The provision for payment of the bonus states as follows:

As additional consideration for the execution of the contract * * * and for the agreement of the player to report for play and practice with the club, and to perform all of the things required by him to be performed under said contract the club agrees to pay the player the sum of $50,000.00.* * *

It also provides that it is distinctly understood that the bonus shall be paid only for the year 1965 and shall not be deemed to be a part of the salary for the year 1966 nor in connection with the excercise of any option on the player's services in any succeeding season. While the latter provision implies that the bonus was part of the salary for the year 1965, it seems illogical that the Cardinals would pay petitioner $50,000 in addition to his specified salary to play football his first year as a professional. It seems more likely that the bonus was paid as an inducement to sign the contract. It would also appear to give petitioner protection against forfeiture of the bonus in the

---

[5] Although petitioner played football at Ole Miss in the fall of 1965 and was offered a contract to play for the Cardinals at the close of 1965 football season, petitioners attribute the bonus received to petitioner's football playing during the 1963 and 1964 seasons. This is apparently because the Cardinals offered the petitioner a contract to play defensive back rather than quarterback, the position petitioner had played at Ole Miss during the 1965 season.

event petitioner did not play football for the Cardinals for the 2 years covered by the contract for some reason beyond his control.

The only evidence offered by petitioner in support of his position, beyond the stipulated evidence, was the testimony of "Bruiser" Kinard, an assistant football coach at Ole Miss during the years petitioner was there, who testified generally about the extra activities required of Ole Miss football players while in college and that, based on his experience over the years, the performance of the players in college football was primarily responsible for the professional football offers received by college players, whether they were offered bonuses, and the amounts thereof. He also testified about petitioner's performance and activities while at Ole Miss and that he assumed they led to the offers of professional football contracts offered to petitioner by both the Cardinals and the New York Jets. However, Kinard did not participate in the negotiation of petitioner's contract and no one who did participate in the negotiations or in the drafting of the contract was called as a witness to testify as to what the bonus was paid for, not even petitioner who was present in the courtroom throughout the trial.

While we might assume that petitioner's performance as a football defensive halfback at Ole Miss in 1963 and 1964 was responsible, in substantial part at least, for the contract he was offered by the Cardinals, it is not clear that petitioner's activities at Ole Miss qualify as "work" within the meaning of section 1303(c)(2)(B), see *Wilson v. United States*, 322 F. Supp. 830, (D. Kan. 1971), or, even if it does, that the bonus was attributable to that work. Conversely, it would also be reasonable to assume that the Cardinals were not paying petitioner $50,000 for football he had played at Ole Miss, but were paying him either to sign their contract rather than sign the New York Jets contract or to play football for the Cardinals in the future.

In any event the burden was on petitioner to prove that the bonus was attributable to work performed by petitioner during 1963 and 1964, and in the absence of evidence indicating that the payment was for something other than stated in the contract, and in the light of our doubts that petitioner's activities at Ole Miss were the type of work intended to be covered by subparagraph (B), we conclude that petitioner has failed to carry his burden of proof, and we must decide this issue against petitioner.[6]

*Decision will be entered for the respondent.*

---

[6] Respondent argues, with reason, that income averaging was intended to provide relief for those persons who worked on a specific project for several years and were paid for that work in the final year, or who had a work product that was sold in one year, and that petitioner's so-called work while at Ole Miss was completed before he negotiated the contract to play pro-football, which was at best a different "work." See *Hendricks v. Commissioner*, 406 F. 2d 269 (C.A. 5, 1969).