WILLIAM L. FROST, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2146–71.   Filed January 28, 1974.

William L. Frost, pro se.
*Nicholas G. Stucky*, for the respondent.

IRWIN, *Judge:* Respondent determined a deficiency of $1,825.10 in the income tax of petitioner for the taxable year 1966.

The sole issue for determination is whether petitioner was an "eligible individual" in 1966 within the meaning of section 1303 [1] thereby entitling him to the benefit of income averaging under sections 1301 through 1305. The resolution of this issue depends upon whether the $15,000 bonus payment made to petitioner in 1966 by the San Francisco Giants Professional Baseball Club (hereinafter called the Giants) was income attributable to work performed by the petitioner in substantial part during two or more of the base period years 1962 through 1965 within the purview of section 1303(c)(2)(B).

---

[1] All references are to the Internal Revenue Code of 1954, as amended, in effect in 1966.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner William L. Frost resided in Berkeley, Calif., at the time his petition in this case was filed. For the taxable year 1966 petitioner filed his individual income tax return with the district director of internal revenue, San Francisco, Calif. On April 23, 1969, petitioner filed an amended Federal income tax return for the taxable year 1966 with the Internal Revenue Service Center, Ogden, Utah. That amended return constituted a timely claim for refund in the amount of $1,826.10. The basis for this refund claim was petitioner's contention that he was entitled to the benefit of income averaging pursuant to the provisions of sections 1301 through 1305. On or about June 6, 1969, the United States made a refund of $1,826.10 to petitioner.

On December 28, 1970, the Commissioner of Internal Revenue issued a statutory notice of deficiency to petitioner determining that petitioner was not entitled to the benefit of income averaging for the taxable year 1966 and asserted the above deficiency of $1,825.10.

Petitioner is a professional baseball player. His baseball experience began in his hometown of Ontario, Calif., where he started pitching in Little League at the age of 10. After his Little League experience petitioner continued to pitch in Ontario's Pony and Colt Leagues.

Petitioner attended Chaffey High School in Ontario, graduating in 1963. During each of his academic years there petitioner played on the high school baseball team. In his senior year he was selected to the all-league team. While attending Chaffey High School petitioner was contacted by several colleges and universities, including Arizona State, UCLA, and the University of California at Berkeley (hereinafter called University of California or Cal) with respect to playing college baseball.

Petitioner chose to attend the University of California and was awarded a baseball scholarship effective at the commencement of his freshman year in the fall of 1963.

In the spring of 1964 petitioner pitched for the Cal freshman team and that summer played American Legion baseball in Ontario.

In the spring of 1965 petitioner was a sophomore and pitched for Cal's varsity baseball team. At the conclusion of the season petitioner was drafted in approximately the 20th round in the annual baseball player draft by the Cincinnati Red Legs. Both the National and American Leagues hold joint selection meetings in the spring of each year at which time the member teams, on a rotating basis, select or "draft" college athletes whom they would, by league rules, have a right to employ.

After the 1965 college draft the Cincinnati Red Legs offered petitioner a $12,000 bonus, a 2-year college scholarship worth $2,000 per year, and a $400-per-month contract with a Cincinnati class A farm team. This offer was rejected by petitioner and apparently no further negotiations took place.

During the summer of 1965 petitioner played nonprofessional baseball for the Grand Junction Eagles Baseball Club of Grand Junction, Colo. Petitioner joined the Grand Junction team because of the excellent coach there.

In the spring of 1966 petitioner was a junior at Cal and again played on the varsity baseball team. Petitioner had an outstanding season in 1966 and was generally considered to be the team's best pitcher. Petitioner was selected for various California all-star teams and was selected as a first-team All-American baseball player by the College Coaches of America.

At the end of the 1966 college baseball season petitioner was the number one draft choice of the San Francisco Giants in a "special phase" draft. The "special phase" draft is conducted annually by the two major leagues to select players, like petitioner, who had previously been drafted but who were not signed.

After the draft, contract negotiations were entered into between petitioner and the Giants. These negotiations culminated in an offer to petitioner which was accepted by him in a telegram dated June 14, 1966.[2]

· The Giants, by their agent, administrative secretary John S. Schwarz, acknowledged petitioner's telegram and confirmed the agreement by telegram dated June 15, 1966.[3]

On June 16, 1966, petitioner entered into a written contract with the Fresno Giants Baseball Club. This ballclub is a farm team of the San Francisco Giants. Although the Fresno team was the contracting party with respect to the contract, the bonus payments in question were in fact paid to petitioner by the Giants and all negotiations

---

[2] The telegram read, in part, as follows :

"I hereby agree to accept terms with the San Francisco Giants baseball organization as follows[ :] A bonus of 30,000 dollars for signing a contract[,] 15,000 dollars payable when contract is approved by National Association of Professional Baseball Leagues and 15,000 dollars payable January sixth 1967[.] Also the incentive bonus plan plus one year college scholarship (2000) for my senior year of college[.] * * *"

[3] This telegram read, in part, as follows :

"This will acknowledge receipt of your telegram accepting our offer of a professional baseball player contract with a club in our organization for 1966 season[.] Salary five hundred dollars month[.] Bonus for signing contract thirty thousand dollars ($30,000) payable as follows : A first installment of fifteen thousand dollars when contract is approved by National Association of Professional Baseball Leagues and final installment of fifteen thousand dollars ($15,000) on January sixth 1967 * * * Understand you will report to Candlestick Park tomorrow to sign contract. * * *"

surrounding the contract were between petitioner (and his authorized representatives) and the Giants (by its authorized representative).[4]

Pursuant to the terms of the contract calling for a cash bonus of $30,000, the Giants paid petitioner the first installment in the amount of $15,000 in 1966 and the final installment in the amount of $15,000 in January 1967. The $15,000 installment paid in 1966 is the income which petitioner seeks to income average.

The Giants' baseball club keeps its books and pays its taxes on the basis of a fiscal and taxable year ending October 31. At the time of the payment of the $15,000 bonus in question, the Giants, on its books and records, treated the $15,000 bonus as a current year's expense. Subsequently in 1968, for the purpose of reporting its Federal income tax liabilities in accordance with Rev. Rul. 67–379, 1967–2 C.B. 127, the Giants capitalized this $30,000 bonus and depreciated said amount over a 48-month period beginning July 1966.

While petitioner was attending Cal, he trained hard to improve his skills as a baseball pitcher. This training was year-round. Throughout these years petitioner received coaching instruction.

During petitioner's sophomore and junior years he was scouted by Edward F. Montague, a talent scout for the Giants. Mr. Montague saw petitioner pitch several games in both of these years. However, it was during petitioner's junior year that Mr. Montague first recommended to the Giants that they draft the petitioner.

This recommendation went to Carl Hubbell, who was director of player development for the Giants. Mr. Hubbell, in his capacity as director of player development, was familiar with petitioner's baseball accomplishments and was also familiar with the facts, circumstances, and negotiations surrounding the bonus contract here in question. According to his testimony all of the $30,000 bonus paid to petitioner was meant as an inducement for petitioner to pitch in the Giants' organization. As Mr. Hubbell explained, the amount of bonus which the Giants offer a college baseball player as an inducement to sign a player contract is based upon what the Giants feel that player will be able to contribute to the Giants' organization in future years.

The Giants would not have paid petitioner anything if petitioner had not signed the contract and agreed to pitch in the Giants' organization.

---

[4] The contract was on a form provided by the National Association of Professional Baseball Leagues and was entitled "Uniform Player Contract." In a space designated for "Special Covenants" the contract provided:

"Player Bill Frost is to receive a cash bonus of Thirty Thousand Dollars ($30,000) for signing this contract, payable as follows: A first installment of Fifteen Thousand Dollars ($15,000) when this contract is approved by the National Association of Professional Base Ball Leagues, and a final installment of Fifteen Thousand Dollars ($15,000) on January 6, 1967."

No part of the bonus was paid to petitioner simply because he developed into a good pitcher at Cal. Similarly, no part of the bonus was paid to petitioner as compensation for his pitching at Cal.

Prior to the negotiations after petitioner's junior year, there was never any agreement beween the Giants and petitioner that the Giants would pay petitioner a bonus if he had a good college baseball career.

During at least 1 of the 4 years preceding 1966, petitioner furnished less than one-half of his support. For the taxable year 1966 petitioner reported $18,554.35 as his adjusted taxable income, of which $15,000 constituted the first installment payment of the bonus here in question. Petitioner had never been married prior to 1967.

OPINION

Sections 1301 through 1305 provide for income averaging. In order to utilize these provisions, a taxpayer must qualify as an "eligible individual" under section 1303.

The general rule to be satisfied in meeting the test of whether a taxpayer is an "eligible individual" is whether such individual has furnished at least one-half of his support during each of the 4 base period years.[5] Sec. 1303(c)(1).

The parties here have stipulated that petitioner has not satisfied the requirements of that section. Accordingly, unless petitioner falls within one of the exceptions to section 1303(c)(1), he is not entitled to average his 1966 income.

In this instance the parties have further stipulated that the only possible exception available to petitioner is the exception contained in section 1303(c)(2)(B). Under that provision, a taxpayer may be an "eligible individual" even though he does not qualify under section 1303(c)(1) if more than one-half of his adjusted taxable income for the computation year is "attributable to work performed by him in substantial part during 2 or more of the base period years."

Therefore, for the petitioner to prevail he must demonstrate that the $15,000 bonus reported on his 1966 tax return was "attributable to work performed by him in substantial part" during 2 or more of the years 1962 through 1965.

It is undeniable that petitioner spent many years of toil and effort in order to improve his skills as a baseball player. These years included 1962 through 1965. It is equally true that this work culminated in the production of a salable product: the ability to play baseball proficiently. It is also equally clear that if petitioner had not spent this time

---

[5] The base period years are the 4 taxable years immediately preceding the computation year. Sec. 1302(c)(3). The computation year is the taxable year for which the taxpayer claims the benefit of income averaging. Sec. 1302(c)(1).

and effort to perfect his skills as a baseball pitcher, the Giants would not have offered the bonus in issue.

The real issue in this case thus turns upon the resolution of the following two questions: (1) Whether petitioner's toil and effort spent in becoming an outstanding college baseball player constituted work within the meaning of section 1303(c)(2)(B); and, if so, then (2) whether the bonus received was attributable to such work.

Petitioner's argument basically is that his pitching ability is a marketable product and that this product was developed over a number of years including the years encompassed by the base period. He further contends that the sale of this product was the direct result of the work involved in developing his pitching skill. In other words, petitioner is claiming that while strictly speaking the bonus payment was designated as an inducement to sign a professional contract, in fact it was attributable to his toil and training in college as a baseball player. Implied in this contention is the argument that this toil and training constitutes work within the meaning of section 1303(c)(2)(B).

In *James B. Heidel*, 56 T.C. 95 (1971), the facts were similar to the ones here. In that case the petitioner was an outstanding football player at the University of Mississippi during the base period years. Immediately after his college career he was drafted by both the New York Jets of the then American Football League and the St. Louis Cardinals of the National Football League. The Cardinals signed Heidel and paid him a $50,000 bonus. The petitioner there contended that his efforts, activities, and performance in connection with his playing college football constituted work within the meaning of section 1303(c)(2)(B) and that the bonus was attributable to such work. Like this case, Heidel's contract indicated that the bonus was paid as an inducement to sign the contract. 56 T.C. at 98, 105. In that case we held that the bonus was not attributable to work performed during at least 2 of the base years.

Specifically, we stated at page 106:

While we might assume that petitioner's performance as a football defensive halfback at Ole Miss in 1963 and 1964 was responsible, in substantial part at least, for the contract he was offered by the Cardinals, it is not clear that petitioner's activities at Ole Miss qualify as "work" within the meaning of section 1303(c)(2)(B), see *Wilson* v. *United States*, 322 F. Supp. 830 (D. Kan. 1971), or, even if it does, that the bonus was attributable to that work. Conversely, it would also be reasonable to assume that the Cardinals were not paying petitioner $50,000 for football he had played at Ole Miss, but were paying him either to sign their contract rather than sign the New York Jets contract or to play football for the Cardinals in the future.

In any event the burden was on petitioner to prove that the bonus was attributable to work performed by petitioner during 1963 and 1964, and in the absence

of evidence indicating that the payment was for something other than stated in the contract, and in the light of our doubts that petitioner's activities at Ole Miss were the type of work intended to be covered by subparagraph (B), we conclude that petitioner has failed to carry his burden of proof, and we must decide this issue against petitioner. [Fn. omitted.]

In that case we did not really come to grips with the issue of what constituted work within the meaning of section 1303(c)(2)(B). The fact that the bonus was paid as an inducement should not preclude a finding that it was also attributable in substantial part to work performed in the base period years.

In *Heidel* we cited *Wilson* v. *United States*, 322 F. Supp. 830 (D. Kan. 1971), in reference to the question of whether the training involved constituted work within the meaning of section 1303(c)(2)(B). In that case a former Miss America contended that she was an "eligible individual" for income averaging under section 1303(c)(2)(B). The plaintiff there argued that her participation in beauty contests and dramatic offerings, her dramatic and modeling courses, and her modeling activities, all of which occurred prior to her Miss America title, constituted work which could be attributable to income which indirectly resulted from her being Miss America. The court there refused to accept these contentions and held that her earnings as Miss America were not attributable to her activities in the base period years. In so holding the court stated at page 832:

It is no doubt true, as plaintiff asserts, that it is the Miss America title and the demand for the titleholder that is indirectly responsible for the income which she receives. However, the title, except for the scholarship, provides only the *opportunity* to earn income. The disputed income in this case was the result of appearances on behalf of various companies and organizations, all of which were made during the period of plaintiff's reign. She was being paid for these appearances, not for winning the title of Miss America, and it is beyond dispute that if she had not made these appearances she would not have received the income at issue. Although it may be true that the plaintiff received invaluable preparation for competition in the Miss America contest through her participation in the activities previously enumerated, and that she did these with the object of becoming Miss America, the work which actually produced the income was performed only during the period of her reign, and not in the years prior to her selection as Miss America. * * * It is the rule that when a statute provides an exception to the general rules governing the taxation of income, the taxpayer claiming its benefits must bring himself clearly within the congressional grant. United States v. Robertson, 190 F.2d 680 (10th Cir. 1951), aff'd. 343 U.S. 711, 72 S.Ct. 994, 96 L.Ed. 1237 (1952). This she has not done. I hold that plaintiff's participation in various activities with the object of achieving the title of Miss America was not "work," within the meaning of the major accomplishment rule.

While the court there flatly stated that the plaintiff's base period activities were not work within the meaning of the statute, this statement was without discussion and was unsubstantiated. In addi-

tion, that case is distinguishable from petitioner's circumstance. In the *Wilson* case, the plaintiff's preparatory activities were aimed at obtaining the title of Miss America. The income received there was clearly attributable to her activities during her reign and not attributable to her base period activities. In petitioner's case the bonus was paid on account of his ability as a pitcher, an ability developed in part during the base period years; it was not a salary for future services. The reading of these cases thus sheds little light upon what constitutes work within the meaning of the statute.

The regulations in this instance are of no help. See sec. 1.1303–1(c) (3), Income Tax Regs. Turning to the congressional intent in enacting the income-averaging provisions and section 1303(c)(2)(B) in particular, we find the following general comments:

A general averaging provision is needed to accord those whose incomes which fluctuate widely from year to year the same treatment accorded those with relatively stable incomes. Because the individual income tax rates are progressive, over a period of years those whose incomes vary widely from year to year pay substantially more in income taxes than others with a comparable amount of total income but spread evenly over the years involved. This occurs because the progressive rates take a much larger proportion of the income in taxes from those whose incomes in some years are relatively high. The absence of any general averaging device has worked particular hardships on professions or types of work where incomes tend to fluctuate. This is true, for example, in the case of authors, professional artists, actors, and athletes as well as farmers, fishermen, attorneys, architects, and others. [H. Rept. No. 749, 88th Cong., 1st Sess. (1963), 1964–1 C.B. (Part 2) 125, 234; S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 505, 644.]

The purpose of section 1301, *et seq.*, is thus to grant relief from the hardship otherwise resulting from the bunching of income received from personal services rendered over a long period of time. But since it is a relief statute, it is to be given "close scrutiny" and is not entitled to a liberal interpretation. The burden is on the taxpayer to show that he comes within the meaning of the statute. See *Breen* v. *Commissioner*, 328 F. 2d 58, 62 (C.A. 8, 1964), affirming a Memorandum Opinion of this Court, certiorari denied 379 U.S. 823 (1964).

Concerning section 1303(c)(2)(B) in particular we find the following statement:

A second concern of this provision is that the individual be a member of the labor force in both the computation year and in the 4 base period years. It has been necessary, however, to approximate this result in some cases. The general rule provides that the individual and his spouse must have furnished one-half or more of his own support in each of the base period years. However, it was not intended to exclude from the benefits of the averaging provision an individual who, although in the labor force, was unemployed in part or all of the base period years. * * * A second exception is provided for the individual who, although not self-supporting in the 4-year base period, nevertheless, has income

in the current year more than half of which is attributable in substantial part to work he has done in two or more of the base period years. This is designed to make sure that those who have performed some work of a substantial nature which occurred over a period of years will be eligible for averaging even though below the 25-year age limit. * * * [H. Rept. No. 749, 88th Cong., 1st Sess. (1963), 1964–1 C.B. (Part 2) 125, 238; S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 505, 648.]

The only other specific reference to section 1303(c) (2) (B) is found in section 211(a) of the Technical Explanation of the section in H. Rept. No. 749, 88th Cong., 1st Sess. (1963), 1964–1 C.B. (Part 2) 422, where an example of its application is given:

B, an unmarried U.S. citizen who was born on January 15, 1945, is a calendar-year taxpayer. B, who had no income previously and whose parents have always furnished more than 50 percent of his support, sells for a large sum in 1964 a novel which he wrote in substantial part in 1962 and 1963. The proceeds of the sale constitute more than 50 percent of B's adjusted taxable income for 1964. Accordingly, B is an eligible individual in 1964 and, if he otherwise qualifies, may choose the benefits of income averaging.

Having reviewed the legislative history of the income-averaging provisions and in particular the discussion pertaining to section 1303 (c) (2) (B), we conclude that work for the purpose of that section means gainful employment during two or more of the base period years which generates income—be it for an employer or self-employment. In this instance petitioner's many years of toil were training to become a professional baseball player. Petitioner was not paid for this effort; [6] all he could hope for was that if he trained hard enough he would become a proficient ballplayer and would ultimately obtain a professional contract.

In the example in the Technical Explanation, the individual there was not training to become a novelist; he was in fact a novelist as evidenced by the sale of his novel. The payments there were for the finished work product, not for the training to produce that finished product.

We, therefore, find that playing college baseball is not work within the purview of section 1303(c) (2) (B). Thus we need not consider the issue of whether such bonus was attributable to petitioner's performance in college. While it may appear that this is a deserving case for income averaging it is the prerogative of Congress, not the courts, to make such a determination.

*Decision will be entered for the respondent.*

---

[6] We note that petitioner received a baseball scholarship while attending Cal, but we are of the opinion that these payments cannot be treated as payments (in the employment sense) for playing baseball. While it is true that an athletic scholarship is based on ability and the promise to participate in the specified sport, the purpose of the funds is to defray the educational costs of attending college and not for playing in the specified sport.