WARING WYCHE, III, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wyche v. Commissioner
Docket No. 7826-77.
United States Tax Court
T.C. Memo 1979-233; 1979 Tax Ct. Memo LEXIS 291; 38 T.C.M. (CCH) 926; T.C.M. (RIA) 79233; June 13, 1979, Filed Marion D. Lamb, Jr., for the petitioner. Willie Fortenberry, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency of $5,319.03 in petitioner's Federal income tax for the calendar year 1974. The issue for decision is whether petitioner is entitled to compute his tax by income averaging under the provisions of sections 1301-1305, I.R.C. 1954. [1] *292 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, who resided in Madison, Florida at the time of the filing of his petition in this case, filed his individual Federal income tax return for the calendar year 1974 with the office of Internal Revenue Service at Chamblee, Georgia. On this return petitioner listed his filing status as "Single." On December 15, 1975, petitioner filed an amended return for the year 1974 in which he claimed the benefits of income averaging. Petitioner was born on October 22, 1954. On March 27, 1955, petitioner's mother, Mary Louise Sullivan Wyche, died. She left no will and under the laws of intestacy of the State of Florida petitioner inherited a one-half interest in her estate. Included in petitioner's inheritance from his mother was approximately 1,280 acres of land. Petitioner's interest in this land was valued at $17,737.50 for estate tax purposes. On January 26, 1973, petitioner sold his interest in the land for $135,808. He received no *293 cash in 1973 but received a first mortgage note. The note, plus accrued interest, was paid in full in 1974 and petitioner on his 1974 Federal income tax return reported the entire realized gain of $116,106.14 as capital gain. Petitioner during 1970, 1971 and part of 1972 was a high school student. During part of 1972, all of 1973 and part of 1974 petitioner attended North Florida Junior College located in his home town of Madison, Florida. During all of the years 1970 through 1973 petitioner lived at home with his parents. After the death of petitioner's mother, petitioner's father remarried. Petitioner's father and his second wife had one son who also lived in the family home during the years 1970 through 1973. Petitioner did not file a Federal income tax return for 1970. In that year, he earned, working on tobacco farms, a total of $534.75 from which $16.60 was withheld for social security resulting in net wages to petitioner for his summer work of $520.15. For the years 1971, 1972 and 1973, petitioner filed Federal income tax returns reporting adjusted gross income of $748.50, $1,363.90 and $2,320, respectively. In addition to the funds received from his earnings during *294 each of the years 1970 and 1971, petitioner received $5 each week from his grandparents. His grandparents also gave him $25 as a Christmas present and $25 on his birthday in each of these years. In 1970 he received a present of $25 from one of his uncles. In 1971 he received a $25 gift for Christmas from one of his uncles and a $100 gift from another. In 1972 he continued to receive $5 a week from his grandparents. In that year, his grandparents gave him $25 for his birthday, $50 for Christmas, and $100 when he graduated from high school. He also received a $25 Christmas gift from one of his uncles and gifts totaling $200 from another uncle. He also received some additional money for graduation gifts. In 1973, petitioner's grandparents continued to give $5him a week. They gave him $25 for his birthday and $25 for a Christmas present. One of his uncles also gave him $25 for Christmas that year.
Petitioner's father in 1972 gave petitioner a Mustang automobile which he bought used for a little less than $1,000.
During all of the years 1970 through 1973, petitioner resided in his father's home and his father paid all the cost of maintaining that home and also all the cost of good *295 and other incidental expenses in connection with the home. Other than lunches during the time he was working in the summer, petitioner during 1970 ate all his meals at his father's home. All the groceries for their meals were purchased by his father. During 1970 through 1973, petitioner's father also purchased some clothes for petitioner. Petitioner paid his incidential expenses such as school lunches, transportation expenses, and entertainment expenses out of his own funds. He also bought his own lunch when he was working in the summer months, and part of the time when he was working in the summer months, bought his own breakfast because he had to be at work at such an parly hour. The other half-interest in the property which petitioner owned was owned by petitioner's father who had inherited his one-half interest from petitioner's mother. The property was vacant land, but during 1970, 1971 and 1972, petitioner and his father rented a portion of the land to a farmer. For 1970 and 1971 the total rental received by petitioner and his father was $220 and for 1972 was $250. [2] The entire amount of rental was actually retained by petitioner's father. *296 Occasionally petitioner and his father would go by and look at their inherited property, but petitioner did not work on the property and nothing to enhance the value of the property from the time he inherited it until he sold it on January 26, 1973. The increase in the value of the property was due solely to appreciation in value of the land and the natural growth of the timber on the land. Petitioner's father on his joint Federal income tax returns for each of the years 1970, 1971, 1972 and 1973, claimed a dependency exemption for petitioner. These joint returns showed that in each of these years petitioner's father's wife received a salary from employment outside the home.On their returns her occupation was listed as "bookkeeper." On his 1970 Federal income tax return, petitioner's father claimed no deduction for real estate taxes under "Itemized Deductions." On his 1971 Federal income tax return petitioner's father claimed under "Itemized Deductions" a deduction for real estate taxes of $1,309.27. Also on that return petitioner's father reported under the designation "House Rent" the amount of $1,150 and claimed a tax deduction of $400 for taxes with respect to that house *297 under "Other expenses" in connection with the rental property. On his 1972 Federal income tax return, petitioner's father claimed under "Itemized Deductions" real estate taxes of $940. Also in this year he reported rental income from a rental house of $1,150 and claimed as part of the "Other expenses" on the rental house taxes of $840.81. In computing depreciation on the house, petitioner's father's Federal tax return showed that the rental house was acquired in January 1970 at a cost or other basis of $8,500. This deprection schedule also showed 3 barns acquired in January 1970, at a cost or other basis of $1,500. The home in which petitioner lived with his parents and brother was on 60 acres of land. Mr. Waring Wyche, Jr. (petitioner's father) had been given the 60 acres of land by his father at the time of his second marriage. Petitioner's father in 1960 or 1961 borrowed $13,000 from the Federal Government under a Farm Home Loan Program and with that $13,000 built the house located on the 60 acres of land. The property was approximately two miles from the town of Madison. The house had approximately 1,300 square feet of living space. It was a three-bedroom, two-bath house. *298 Petitioner and his brother each had one of the bedrooms. It had a living room/dining room combination across the front and also had a family room and kitchen. Petitioner made monthly payments on his Government loan on the house in 1970 and 1971 of $75. In late 1971 petitioner refinanced the house. Although the new loan was for less than the original loan, because of the increased interest rate on the refinancing and the fact that the new loan was to be repaid in 8 years rather than 20 years as the original loan had, been, the monthly payments petitioner's father made on his home mortgage increased in 1972 to $100 a month. On his 1970 Federal income tax return petitioner's father deducted $146.20 under itemized deductions for "Interest expense--Home mortgage." In 1971, 1972 and 1973, under "Interest expense--Home mortgage" petitioner's father deducted $205.97, $980 and $910.21, respectively. Most of the furnishings in the house in which petitioner lived with his family had been purchased by petitioner's father. However, the bedroom suite used in the master bedroom was a suite which had belonged to petitioner's mother through inheritance from her parents shortly prior to *299 her death. There was also in the house during 1970 through 1973 a spinet piano which had belonged to petitioner's mother at the time of her death and a few miscellaneous pieces of furniture such as small tables. On each of his Federal income tax returns for the years 1971 through 1973, petitioner's father claimed a $150 deduction for insurance premium for medical care, and on his 1970 return claimed $144 for this item as an itemized deduction. In each of these years petitioner's father under "Charitable Deductions" claimed church contributions.
Respondent in his notice of deficiency to petitioner made no changes in the taxable income as reported by petitioner but computed the tax on this income using the tax table applicable to a single taxpayer. In this notice of deficiency respondent stated that the issue raised by petitioner in his amended return electing to compute his tax by using the income averaging method had been considered and it had been determined that petitioner was not entitled to use this method for computing his tax liability. Petitioner does not contest the use of the tax table for a single taxpayer for the computation on his tax stating that it was mere inadvertence *300 that the return had used the table for a married person filing jointly. In his petition, petitioner assigned error only to respondent's determination that he was not entitled to the use of income averaging for the year 1974. OPINION Section 1301 provides that an eligible individual who meets certain specified standards is entitled to elect to compute his tax by income averaging. Section 1303(a) defines an eligible individual to be an individual except as otherwise provided in the section who is a citizen or resident of the United States in the computation year. Section 1303(c)(1) provides that an individual shall not be an eligible individual for the computation year if, for any base period years, such individual furnished less than one-half of his support. Section 1302(c)(2) provides that the base period years are the four taxable years immediately preceding the computation year.
Section 1303(c)(2) provides for exceptions to the rule of section 1303(c)(1). [3]
*301 Petitioner contends that he meets the requirements of section 1303(c)(1) since for each of the base period years 1970 through 1973, he furnished over one-half of his own support. Alternatively, he argues that in any even he comes within the exception of section 1303(c)(2)(B) in that more than one-half of his taxable income for the computation year "is attributable to work performed by him in substantial part during 2 or more of the base period years, * * *." He makes no argument that he falls within the exceptions of section 1303(c)(2)(A) or (C). The facts clearly show that he does not since the facts show he did not become 20 years old until October 22, 1974, the computation year, and therefore does not meet the provisions of section 1303(c)(2)(A) of having attained the age of 25 during the computation year. The facts also show that petitioner filed an individual return and therefore does not meet the requirement of section 1303(c)(2)(C) that he file a joint return for the computation year. In an effort to support his contention that he contributed more than one-half of his own support in each of the years 1970 through 1973, petitioner testified that out of his own funds for *302 the year 1970 he spent approximately $60 for transportation; $175 for food; $120 for clothing; $260 for recreation; and $25 for school supplies. Petitioner stated that in addition to this $640 he "gave" his father his $110 part of the rent from their joint property. Petitioner testified that in 1971, on the items of transportation, food, clothing, recreation and school supplies, he spent a total of $795 and again "gave" his father his $110 from the joint rent. He testified that in 1972 he spent approximately $300 on transportation; $520 on food for himself; $240 on clothing; $500 on entertainment and recreation; and $210 on school and school supplies since that year he was entering college. He testified that in 1973 he spent $520 on food; $520 on entertainment; $240 on clothing; $250 on education; $1,200 on transportation; and in addition "gave" his father $125 from rent of their joint land. Petitioner testified that he did not know the total amount of his support during the years 1970 through 1973. Petitioner's father estimated that petitioner's total support during the year 1970 was $1,425. In coming to this estimate, he estimated that petitioner's share of the total cost *303 for rent, utilities, and food in the family house was $770. He testified that he arrived at this figure by dividing the total estimated cost of these items by 4. He stated that when he offset the amount he considered he had paid of petitioner's expenses by the $110 of rent that belonged to petitioner, he arrived at $675 he spent for petitioner's support during 1970 as compared to $750 that petitioner spent. Without going into detail, petitioner's father, using the items of rent, food and utilities only as paid for petitioner by him arrived at total support of $1,613 for petitioner in 1971, of which he had contributed $708 since he offset the addition of the items he estimated he had spent by the $110 that he said should have been petitioner's part of rent of the land they owned. Petitioner's father, again using estimates, estimated petitioner's total support for 1972 at approximately $2,740, and using only the same items used in previous years as amounts he paid toward petitioner's support he estimated that he contributed approximately $970 towards petitioner's support and petitioner contributed $1,770. He testified that in 1973 petitioner's total support was approximately $3,800, *304 of which he contributed approximately $950.
Petitioner's father testified that he used for rent the amount of payments he was making on his home mortgage which were $900 in 1970 and 1971 and $1,200 in 1972 and 1973. He estimated utilities at $30 a month in 1970, slightly more in each succeeding year, the estimate for 1973 being $50 a month. When questioned as to what would be the fair rental value of the house, petitioner's father stated that he had no experience with rentals and did not know. It is difficult to understand how he could answer in this manner when his tax return for 1971 showed income from rental of a house acquired in 1970 at a cost or other basis of $8,500 (or $10,000 if the barns are included) of $1,150. Certainly petitioner's father knew that the fair rental value of a house he had built in 1961 at a cost of $13,000 exclusive of land was well in excess of $75 a month. Using the same percent of rent to cost as the house for which rent was reported on petitioner's return, the fair rental value of the house would be at least $1,500 a year in 1970 and 1971. On the basis of this record we conclude that the fair rental value of the house in which petitioner lived *305 with his parents in 1970 was at least $1,500. Certainly petitioner has not shown it to be less. Petitioner's father apparently thought that "rent" was equated with the amount of monthly payments he made on his mortgage. The amount of monthly mortgage payments on a house has no necessary relationship to the fair rental value of the house. The fair rental value of lodging furnished to a dependent is the amount of support furnished to the dependent by the person furnishing the lodgings. Blarek v. Commissioner,23 T.C. 1037 (1955). If $1,500 instead of $900 is used in 1970 as the fair rental value of the house, even using the other figures used by petitioner's father in his estimate of his contribution to petitioner's support in that year, petitioner's total support would be $1,575 of which petitioner's father would have contributed at least $825. The record here is therefore clear that in 1970, one of the base period years, petitioner did not contribute one-half of his support. Therefore, he has failed to meet the requirement of section 1303(c)(1) that he had furnished over half of his support in each of the four base period years. Heidel v. Commissioner,56 T.C. 95, 100 (1971). *306 However, there are many clear indications in this record that petitioner's father did furnish over one-half of petitioner's support in 1970, 1971 and 1972. Petitioner's father did not include in his estimate of utilities the cost of telephone service in any year.When it was pointed out to petitioner's father that when his estimated costs for lodging and utilities for four people were subtracted from his total amount of these items plus food, only $1,800 remained for cost of groceries and incidental household goods for four people including a teenage son, he stated he did not know what the groceries cost. He seemed to realize himself that $1,800 was unrealistically low. This is particularly true of a family where the wife is gainfully employed outside the home. Petitioner's father did not testify whether his health insurance policy covered petitioner and if so the amount applicable to petitioner. He did not testify with respect to who paid the taxes on the property jointly owned by him and petitioner, and whether the rent he and his son received from the inherited property went to pay these taxes. He was questioned on cross-examination about the real estate taxes he deducted *307 and stated they were for "this, that and the other." None of the expenses of the automobile petitioner used prior to the time in 1972 when his father gave him an automobile were included in petitioner's support. Petitioner testified that the amount he estimated as transportation toward the end of 1970 when he drove a little bit included gas for the automobile and that in 1971 his estimate of transportation expense of $15 a month was because he was driving more and had to spend more money on gas.Since petitioner did not own an automobile, apparently his driving would have been in his father's automobile and certainly petitioner's pro rata part of the automobile expenses such as insurance and repairs should be included in computing his support. His father made no estimate of the amounts of any gifts which he made to petitioner such as Christmas or birthday gifts as part of petitioner's support in any year.No amount was included in petitioner's support for such items as laundry, dry cleaning or personal toilet items such as toothpaste even though obviously a 15 to 18-year old had some such expenses included in his support. Presumably, his father paid for such items since petitioner *308 did not testify that he paid for them. Petitioner's father made no allowance in determining the amount he contributed to petitioner's support for the fair rental value of the furnishings in the house. Petitioner argues that actually some of these furnishings were owned half by petitioner through an inheritance from his mother at her death in 1955. The record, however, shows that the great majority of the furnishings in the house, including all of the kitchen equipment and petitioner's bedroom suite, was purchased by petitioner's father. Also, the record is not clear as to the nature of the $5 a week given to petitioner by his grandparents. If these $5 a week were in the nature of an allowance for spending money for petitioner, as they appear to be, these amounts would be a contribution by petitioner's grandparents to his support. Considering this record as a whole, we consider it clear that petitioner did not pay over one-half of his support in 1970. We likewise find it to be clear, including the automobile which petitioner's father gave to petitioner in 1972 as part of petitioner's support in that year, that petitioner's father in 1972 paid over half of petitioner's support. *309 It is interesting to note that petitioner in estimating what he paid for his own support in 1973 included the cost of a truck he bought for himself, but petitioner's father did not include the cost of the automobile he gave to petitioner in 1972 as a part of what he contributed to petitioner's support. Properly the cost of the automobile should be included in petitioner's support for 1972 as should the cost of the various other items we have listed above and petitioner's pro rata part of the fair rental value of the house and furnishings. On the basis of this record we conclude that petitioner did not furnish one-half of his own support in any of the years 1970, 1971 and 1972.
It is less clear whether petitioner furnished one-half of his own support in 1973 than it is with respect to the other years. The same deficiency exists with respect to the amount of support contributed for petitioner by his father in 1973 as exists in the other years here involved. However, considering the amount petitioner earned in 1973, and the additional expenses occasioned by his attending college which were the type of expense he paid from his own funds, it may be that petitioner did furnish over *310 half of his support in 1973. However, this record does not contain sufficient evidence to show whether petitioner's father paid over half of petitioner's support even for 1973. We note that petitioner's father claimed petitioner as a dependent on his Federal income tax return for each of the years 1970 through 1973. Petitioner's father testified that he knew when he claimed petitioner as a dependent in each of these years that he could only claim petitioner as a dependent if he contributed more than one-half of petitioner's support in that year. On the basis of this record we conclude that petitioner did not furnish one-half of his support in 1970, 1971 and 1972 and has failed to prove that he furnished one-half of his support in 1973. Failure to furnish one-half of his own support in any one of these years causes petitioner not to be eligible for income averaging under the provisions of section 1303(c)(1).
Petitioner argues that if he fails to qualify for income averaging under section 1303(c)(1), then he does qualify under section 1303(c)(2)(B). He argues that since most of his income in 1974, the computation year, is capital gain income, which is unearned, he does not have *311 to show that this income was attributable to work performed by him in two of the base period years to qualify for the exception to section 1303(c)(1) provided by section 1303(c)(2)(B). Petitioner contends that section 1.1303-1(c)(3) of the Income Tax Regulations which provides to the contrary is invalid. [4] This regulation is in effect a paraphrase of the statute. Petitioner points out that prior to the amendment of the income averaging provisions by the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 586, income permitted to be averaged was only earned income but since the passage of the Tax Reform Act of 1969 averagable income *312 includes capital gains. The only change made in the provisions of section 1303(c)(2)(B) by the Tax Reform Act of 1969 was to change the phrase "adjusted taxable income" to "taxable income." This change is referred to in Pub. L. 91-172 (the Tax Reform Act of 1969), section 311(d)(1) as a "Conforming Amendment." See Pub. L. 91-172, 1969-3 C.B. 10, 68. The change in substance in the income averaging provisions was made by changing sections 1302 and 1303 to include in the term "averagable income" items of income not produced by a taxpayer's own labor. The change is explained in H. Rept. No. 91-413, 82d Cong., 1st Sess. (1969), to accompany H. Rept. No. 13270, 1969-3 C.B. 200, 252-253, as follows: Certain types of income are not eligible for averaging, however, and must be subtracted from taxable income in determining taxable income eligible for averagin. The principal types of income not eligible for averaging are net long-term capital gains, income from gifts if in excess of $3,000, and income from wagering. These income items (as well as a few relatively rare items) are subtracted from current year taxable income to determine current year "adjusted taxable *313 income." The determination of adjusted taxable income for the prior 4 years (the base period) is essentially the same. * * * * * *
If a taxpayer has taxable income which is not eligible for averaging (such as long term capital gains, income from gifts or from wagering), the tax computation requires additional steps because it is necessary to divide the income into several segments in order to determine the tax attributable to one-fifth of averagable income. The segments of taxable income are conceptually "stacked" from the standpoint of the tax rate brackets applicable to the segments. There are various reasons why certain types of income originally were made ineligible for averaging. * * * Long-term capital gains were originally excluded from averaging because the 50-percent deduction and 25-percent alternative rate were considered to provide capital gains with their own specialized form of averaging. The 50-percent exclusion does not, however, provide true averaging because it does not distinguish between taxpayers with constant amounts of capital gains income and those with widely fluctuating amounts of this type of income.Progressive tax rates impose a higher tax *314 on the latter type of taxpayer. It is this dependence of tax liability on the timing of income that income averaging was designed to mitigate. Moreover, not permitting the averaging of capital gains gives the benefits of averaging to a taxpayer whose total income remains constant but has a widely varying composition. In order to simplify the income averaging computation and make averaging more easily available to taxpayers and also because there does not appear to be adequate reason for denying averaging to those types of income, your committee has concluded that income from gifts, wagering income, and long-term capital gains should be included in income eligible for averaging. * * * Nothing in either the statute or the committee report in any way indicates that any change was intended to be made with respect to the requirement necessary to meet the exception to section 1303(c)(1) provided for in section 1303(c)(2)(B).Since after the change made in other sections, averagable income was taxable income, rather than "adjusted taxable income," a conforming amendment was needed to section 1303(c)(2)(B) to remove the word "adjusted." There is no indication of any intention by Congress *315 to change the substantive provisions of section 1303(c)(2)(B) and no such change is made in the language of the statute. It is clear from this record that practically all of petitioner's income in 1974, the computation year, was from a capital gain which was in no way related to any work he did in any preceding year, but was merely due to appreciation in the value of his property. Therefore petitioner does not come within the literal language of the exception to the provisions of section 1303(c)(1) contained in section 1303(c)(2)(B). In Frost v. Commissioner,61 T.C. 488, 495-496 (1974), we discussed at some length the congressional history of section 1303(c)(2)(B). We there quoted a portion of the committee reports which stated that section 1303(c)(2)(B) was intended not to exclude from the income averaging provisions persons who had "performed some work of a substantial nature which occurred over a period of years" H. Rept. No. 749, 88th Cong., 1st Sess. (1963), 1964-1 C.B. (Part 2) 125, 238. We quoted the example given in section 221(a) of the Technical Explanation of the section in H. Rept. No. 749, 88th Congress, 1st Sess. (1963), 1964-1 C'B. (Part 2) 422, *316 of an unmarried person under 25 who is supported by his parents during 1962 and 1963 while writing a novel which he sells in 1964 as a person meeting the requirements of section 1303(c)(2)(B) if he otherwise qualifies for income averaging. The Frost case dealt with the year 1966. However, as heretofore pointed out the change in the statute (sections 1301-1305) made by the Tax Reform Act of 1969 did not change the provisions of section 1303(c)(2)(B) except by a conforming amendment which had no effect on its substantive provisions. Therefore, the holding in the Frost case with respect to the application of section 1303(c)(2)(B) is valid for the year here in issue. Since none of petitioner's income in the computation year was attributable to work performed by him during two or more of the base period years, petitioner does not fall within the exception to section 1303(c)(1) provided for by section 1303(c)(2)(B). Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended an in effect during the year here involved.↩
2. Petitioner actually testified that this amount was for 1973 and testified to no amount for 1972. However, since the property was sold on January 26, 1973 we assume petitioner intended to testify that the $250 rent was for 1972.↩
3. SEC. 1301. LIMITATION ON TAX. If an eligible individual has averagable income for the computation year, and if the amount of such income exceeds $3,000, then the tax imposed by section 1 for the computation year which is attributable to averagable income shall be 5 times the increase in tax under such section which would result from adding 20 percent of such income to 120 percent of average base period income. SEC. 1302. DEFINITION OF AVERAGABLE INCOME; RELATED DEFINITIONS. * * *
(c) Other Related Definitions.--For purposes of this part-- * * *
(2) Base Period.--The term "base period" means the 4 taxable years immediately preceding the computation year. SEC. 1303. ELIGIBLE INDIVIDUALS. (a) General Rule.--Except as otherwise provided in this section, for purposes of this part the term "eligible individual" means any individual who is a citizen or resident of the United States throughout the computation year. * * *
(c) Individuals Receiving Support From Others.-- (1) In General.--For purposes of this part, an individual shall not be an eligible individual for the computation year if, for any base period year, such individual (and his spouse) furnished less than one-half of his support. (2) Exceptions.--Paragraph (1) shall not apply to any computation year if-- (A) such year ends after the individual attained age 25 and, during at least 4 of his taxable years beginning after he attained age 21 and ending with his computation year, he was not a fulltime student, (B) more than one-half of the individual's taxable income for the computation year is attributable to work performed by him in substantial part during 2 or more of the base period years, or (C) the individual makes a joint return for the computation year and not more than 25 percent of the aggregate adjusted gross income of such individual and his spouse for the computation year is attributable to such individual.↩
4. Section 1.1303-1(c)(3), Income Tax Regs., provides: Sec. 1.1303-1(c)(3). Major accomplishment rule.↩ Notwithstanding the general rule contained in section 1303(c)(1) and subparagraph (1) of this paragraph, an individual may be an eligible individual for a computation year if more than 50 percent of his taxable income for the computation year is attributable to work performed by him in substantial part during two or more of his four-base-period years. It is not necessary that the individual perform any of the work in his computation year.